UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :

     - v. -                       :

AMEET GOYAL,                      :

               Defendant.         :

- - - - - - - - - - - - - - - - - x

### SUPERSEDING INDICTMENT

S1 19 Cr. 844 (CS)

### COUNT ONE
### (Health Care Fraud)

The Grand Jury charges:

### OVERVIEW OF THE FRAUDULENT SCHEME

1.   From at least in or about  January 2010 up to and including at least in or about March 2017 (the "Relevant Time Period"), AMEET GOYAL, the defendant, and others known and unknown, participated in a scheme to defraud patients, the Medicare Program, and  private  insurance  plans  with  respect  to  billing  for ophthalmologic medical services.

2.   In order to effectuate the scheme, among other things, AMEET GOYAL, the defendant, submitted and caused to be submitted false and fraudulent claims to the Medicare Program and private insurance plans, including claims for services to patients that were not rendered, claims that misrepresented the services provided, and claims that falsely billed for a level of service higher or more complicated than the level performed. In addition,

AMEET GOYAL, the defendant, sent bills to individual patients for services that were not rendered, that misrepresented the services provided, and that falsely billed for a level of service higher or more complicated than the level performed.

3. During the course of the scheme, AMEET GOYAL, the defendant, billed the Medicare Program, private insurance plans, and patients at least approximately $8 million for certain supposedly performed surgical procedures, including orbitotomies, conjunctivoplasties performed in parallel to orbitotomies, and excisions and repair of eyelid. GOYAL and his ophthalmology Practice received over $3 million in payments for such claims. A substantial portion of these claims contained fraudulent billing for procedures not performed.

## THE DEFENDANT AND RELEVANT PERSONS AND ENTITIES

4. At all times relevant to this Indictment, AMEET GOYAL, the defendant, was an ophthalmologist and oculoplastic surgeon, certified by the American Board of Ophthalmology, and licensed to practice medicine in New York State.

5. At all times relevant to this Indictment, AMEET GOYAL, M.D. P.C., (doing business as Eye Associates Group, Rye Eye Associates, and other business names, and collectively, the "Practice"), was an ophthalmology and oculoplastic medicine practice that operated an office in Rye, New York. At certain

2

times relevant to this Indictment, the Practice also operated ophthalmology practices in Wappingers Falls and Mt. Kisco, New York, and Greenwich, Connecticut.

6.    AMEET GOYAL, the defendant, formed, owned, operated, and practiced at the Practice.  The Practice also employed, at various times relevant to this Indictment, certain other ophthalmologists and oculoplastic surgeons who reported to GOYAL (collectively with GOYAL, the "Ophthalmologists").

BACKGROUND ON MEDICARE AND PRIVATE HEALTH CARE BENEFIT PROGRAMS

7.    At all times relevant to this Indictment, the Medicare Program ("Medicare") was a federal health care program providing benefits to persons who are over the age of 65 or disabled.  Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services.  Individuals who received benefits under Medicare were referred to as Medicare "beneficiaries."

8.    Medicare was a "health care benefit program" as defined by Title 18, United States Code, Section 24(b) and referenced in Title 18, United States Code, Section 1347.

9.    Medicare was subdivided into multiple Parts. Medicare Part B generally covered the costs of physicians' services and outpatient care.  Generally, Medicare Part B covered such costs

3

if, among other requirements, they were medically necessary and
ordered by a physician.

10.    In order to bill the Medicare program, a health
care provider was required to complete an enrollment application
and be approved to participate in the program.  Once approved, the
provider was assigned a unique Medicare provider number.  Each
claim for reimbursement submitted on behalf of a health care
provider — whether in paper form or electronically — must have
identified that claimant's Medicare provider number.  Upon
enrollment, and periodically thereafter, each Medicare provider
was furnished with information relevant to participating in the
program and how to bill for services rendered.

11.    To receive payment from Medicare for a covered
service, a medical provider was required to submit a claim, either
electronically or in writing, through Form CMS-1500 or Form UB-
92.  These forms required a provider to state a diagnosis of the
patient's condition and provide a procedure code (which codes are
established and published by the American Medical Association),
known as a CPT code, identifying the service or services rendered.
The Medicare program required that a provider certify the services
rendered were medically necessary and were furnished by that
provider.  Providers participating in Medicare must have agreed in
writing that they will be responsible for the accuracy of all

4

claims submitted by themselves, their employees or their agents, and that all claims submitted under their provider numbers will be accurate, complete, and truthful.

12. At all times relevant to this Indictment, the Practice submitted claims to private insurance plans, affecting commerce, under which medical benefits, items and services were provided to individuals (collectively, the "Private Benefit Programs").

13. Each of the Private Benefit Programs is a "health care benefit program" as defined by Title 18, United States Code, Section 24(b) and referenced in Title 18, United States Code, Section 1347.

14. To receive reimbursement or payment from the Private Benefit Programs, the Practice submitted claims, based on CPT codes, either electronically or in writing, for payment of services, either directly or through a billing company.

## SERVICES COVERED BY MEDICARE AND THE PRIVATE BENEFIT PROGRAMS

15. Medicare and the Private Benefit Programs (collectively, the "Insurance Providers") covered the costs of certain medical tests, procedures, and other medical services. Generally, the Insurance Providers covered these costs only if, among other requirements, the medical services were actually rendered and were medically necessary.

5

16.   The Insurance Providers covered the costs of ophthalmological services and oculoplastic surgery services, including excisions of chalazions, excision of eyelid, full thickness, orbitotomy, and conjunctivoplasty.

17.   At all times relevant to this Indictment, the Ophthalmologists in the Practice commonly treated a minor eyelid condition called a chalazion.  A chalazion is a small, typically painless bump that appears on the eyelid usually due to a blocked oil gland.  Chalazions are commonly treated with warm compresses and gentle massage to clear up on their own.  Chalazions that require surgical intervention, typically referred to as "excision of chalazion," are often treated through an incision on the eyelid and drainage –– a type of eyelid surgery.  An ordinary excision of chalazion is generally performed under local numbing anesthesia and is typically completed in less than 15 minutes.

18.   Under the relevant coding guidelines for the Insurance Providers, an excision of chalazion must be billed under its specific CPT code and not as some other service, such as an excision and repair of eyelid, orbitotomy, or conjunctivoplasty. During the Relevant Time Period, AMEET GOYAL, the defendant, billed Insurance Providers and patients CPT codes associated with treatment of a chalazion fewer than 40 times for his own procedures.  GOYAL billed these chalazion-related CPT codes at

approximately $400 and received an average payment of approximately $200 for each of his procedures billed under those codes.

19. An excision and repair of eyelid, as coded under CPT code 67961, is a type of eyelid surgery involving reconstruction or removal of certain lesions other than chalazions. During the Relevant Time Period, AMEET GOYAL, the defendant, billed Insurance Providers and patients CPT code 67961 over 1,600 times for his own procedures. GOYAL billed CPT code 67961 at approximately $1,500, and received an average payment of approximately $500 for each of his procedures billed under that code.

20. An orbitotomy is a significant surgical procedure into the orbit of the eye, often to remove an orbital tumor. A typical orbitotomy usually requires at least monitored anesthesia care or general anesthesia, and generally takes approximately an hour or more to perform. An orbitotomy is a more complex, time-consuming, and expensive surgery than the excision of chalazion. During the Relevant Time Period, AMEET GOYAL, the defendant, billed Insurance Providers and patients CPT codes associated with an orbitotomy over 1,400 times for his own procedures. GOYAL billed these orbitotomy-related CPT codes at approximately $2000, and

7

received an average payment of approximately $950 for each of his procedures billed under those codes.

21.   A conjunctivoplasty is a procedure that generally removes or rearranges a part of the conjunctiva, the clear, thin membrane that covers a part of the front surface of the eye, and the inner surface of the eyelids. A conjunctivoplasty is sometimes performed to graft or extend tissue onto a conjunctival wound.  It is a different procedure than the excision of chalazion.  During the Relevant Time Period, AMEET GOYAL, the defendant, billed Insurance Providers and patients CPT codes associated with a conjunctivoplasty over 700 times together with a bundled "orbitotomy" for the same patient.  GOYAL billed these bundled conjunctivoplasty-related CPT codes at approximately $2000 or $2,500, and received an average payment of approximately $400 — in addition to the orbitotomy payments — for each of his procedures billed under those codes.

## OVERVIEW OF THE HEALTH CARE FRAUD SCHEME

22.   In order to effectuate the scheme to defraud, AMEET GOYAL, the defendant, and others known and unknown, systematically submitted claims for procedures not performed, such as orbitotomies, conjunctivoplasties, and excision and repair of eyelid, when in fact, those surgeries were not performed, and the

procedure actually performed was an excision of chalazion or other similar lower-paying minor eyelid procedure.

23. To further effectuate the scheme, among other things, AMEET GOYAL, the defendant, directed employees of the Practice to falsify billing documents and other medical records, by, among other things, characterizing excisions of chalazions and other minor procedures as higher-paying surgeries, such as orbitotomies with conjunctivoplasties. As part of the scheme, GOYAL threatened the livelihood of employees of the Practice who were reluctant to comply with these directions. GOYAL also personally falsified certain patient medical records, including his own operating reports, to falsely describe procedures he did not perform in order to match his fraudulent billing claims.

24. From approximately January 2010 through approximately March 2017, AMEET GOYAL, the defendant, and others known and unknown at the Practice, billed the Insurance Providers and patients over $8 million for supposedly performed orbitotomies, parallel conjunctivoplasties, and excisions and repair of eyelid, and received over $3 million in payments for such claims. A substantial portion of these claims contained fraudulent billing for procedures not performed.

25. The Insurance Providers paid these fraudulent claims through, among ways, interstate wire transfers into a bank

account established and controlled by AMEET GOYAL, the defendant, in the Southern District of New York.

26.   As part of the scheme, AMEET GOYAL, the defendant, caused debt collection procedures to be initiated against multiple patients who did not pay the full amount of fraudulently billed procedures that were not performed.

## STATUTORY ALLEGATIONS

27.   From at least in or about January 2010 up to and including in or about March 2017, in the Southern District of New York and elsewhere, AMEET GOYAL, the defendant, knowingly and willfully executed, and attempted to execute, a scheme and artifice to defraud a health care benefit program and to obtain, by means of false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, a health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services, to wit, AMEET GOYAL participated in a scheme to defraud the Insurance Providers by making materially false statements in claims for payment for the provision of medical services.

(Title 18, United States Code, Sections 1347 & 2.)

## COUNT TWO
### (Wire Fraud – Healthcare Fraud Scheme)

The Grand Jury further charges:

28.   The allegations set forth in paragraphs 1 through 27 of this Indictment are repeated and realleged as if fully set forth herein.

29.   From at least in or about January 2010 up to and including in or about March 2017, in the Southern District of New York and elsewhere, AMEET GOYAL, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, and attempting to do so, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, AMEET GOYAL participated in a scheme to defraud the Insurance Providers and the patients by making and causing others to make materially false statements in claims for payment for the provision of medical services, and in furtherance thereof, AMEET GOYAL caused wire communications to be sent in interstate commerce, including through electronic claims made to Insurance Providers and payments received from Insurance Providers.

11

(Title 18, United States Code, Sections 1343 & 2.)

## COUNT THREE
**(False Statements Relating to Health Care Matters)**

The Grand Jury further charges:

30.  The allegations contained in paragraphs 1 through 29 of this Indictment are repeated and realleged as if fully set forth herein.

31.  From at least in or about January 2010 up to and including in or about March 2017, in the Southern District of New York and elsewhere, AMEET GOYAL, the defendant, in matters involving health care benefit programs, and in connection with the delivery of and payment for health care benefits, items, and services, willfully and knowingly did falsify, conceal, and cover up by trick, scheme, and device, material facts, and make materially false, fictitious, and fraudulent statements and representations, and did make and use materially false writings and documents knowing the same to contain materially false, fictitious, and fraudulent statements and entries, to wit, AMEET GOYAL made and caused others to make materially false statements to the Insurance Providers in claims for payment for the provision of medical services.

(Title 18, United States Code, Sections 1035 & 2.)

12

## COUNT FOUR
### (Bank Fraud)

The Grand Jury further charges:

32. The allegations contained in paragraphs 1 through 31 of this Indictment are repeated and realleged as if fully set forth herein.

33. On November 21, 2019, an original indictment (the "Original Indictment") was returned in the action *United States of America v. Ameet Goyal*, 19 Cr. 844 (CS) (S.D.N.Y.). The Original Indictment charged AMEET GOYAL, the defendant, with the same three counts as listed in Counts One, Two, and Three of this superseding Indictment: healthcare fraud, wire fraud, and making false statements relating to healthcare matters, in violation of Title 18, United States Code, Sections 1347, 1343, 1035, and 2.

34. On November 22, 2019, AMEET GOYAL, the defendant, was arraigned on the Original Indictment and placed on release pursuant to an order dated November 22, 2019, from the United States District Court for the Southern District of New York, which order notified GOYAL of the potential effect of committing a criminal offense while on pretrial release.

## BACKGROUND ON SMALL BUSINESS ADMINISTRATION LENDING IN RESPONSE TO COVID-19

35. The United States Small Business Administration (the "SBA") is a federal agency of the Executive Branch that

13

administers assistance to American small businesses. This assistance includes guaranteeing loans that are issued by certain lenders to qualifying small businesses. Under the SBA loan guarantee programs, the actual loan is issued by a commercial lender, but the lender receives the full faith and credit backing of the United States Federal Government on a percentage of the loan. Therefore, if a borrower defaults on an SBA-guaranteed loan, the commercial lender may seek reimbursement from the SBA, up to the percentage of the guarantee. By reducing the risk to commercial lenders, the SBA loan guarantee programs enable lenders to provide loans to qualifying small businesses when financing is otherwise unavailable to them on reasonable terms through normal lending channels. When a borrower seeks an SBA-guaranteed loan, the borrower must meet both the commercial lender's eligibility requirements for the loan as well as the SBA's eligibility requirements.

36. The Coronavirus Aid, Relief, and Economic Security ("CARES") Act is a federal law enacted on March 29, 2020 designed to provide emergency financial assistance to the millions of Americans who are suffering the economic effects caused by the COVID-19 pandemic. One source of relief provided by the CARES Act was the authorization of up to $349 billion in forgivable loans to small businesses for job retention and certain other expenses

14

through the Paycheck Protection Program (the "PPP").  On April 24, 2020, the Paycheck Protection Program and Health Care Enhancement Act was signed into law, authorizing over $300 billion in additional PPP funding.  On June 5, 2020, the Paycheck Protection Program Flexibility Act ("PPPFA") was signed into law, amending certain terms of the PPP.

37.  As of the relevant dates of the Loans discussed below, the PPP allowed qualifying small businesses and other organizations to receive unsecured SBA-guaranteed loans with a maturity of two years and interest rate of one percent.  PPP loan proceeds must be used by businesses on payroll costs, mortgage interest, rent, and/or utilities.  The PPP allowed the interest and principal to be forgiven if businesses spend the proceeds on these expenses within eight weeks of receipt and use at least 75% of the forgiven amount for payroll.  Pursuant to the CARES Act, the amount of PPP funds a business was eligible to receive was determined by the number of employees employed by the business and their average payroll costs.  The maximum loan amount was generally limited to 2.5 times the business's average monthly payroll expenses.  Businesses applying for a PPP loan must provide documentation to confirm that they have in the past paid employees the compensation represented in the loan application.  Eligible businesses must have been in operation on or before February 15,

15

2020 and either had paid employees or independent contractors. Businesses must have been overseen by the SBA, which has authority over all PPP loans, but individual PPP loans are issued by approved commercial lenders who receive and process PPP applications and supporting documentation, and then make loans using the lenders' own funds.

38.   Applicants   with   pending   criminal   charges   are ineligible for PPP loans.   Question Five on the PPP borrower application form (the "Pending Charges Question") requires the applicant to answer "Yes" or "No" to the following question:   "Is the Applicant (if an individual) or any individual owning 20% or more of the equity of the Applicant subject to an indictment, criminal information, arraignment, or other means by which formal criminal charges are brought in any jurisdiction, or presently incarcerated, or on probation or parole?"

39.   An applicant is required to initial his or her response to the Pending Charges Question.

40.   The PPP borrower application expressly advises that if the Pending Charges Question is answered "'Yes,'" then "the loan will not be approved."

41.   The PPP borrower application also requires the applicant to make and place his or her initials by the following certifications, among others:

a.   "During the period beginning on February 15, 2020 and ending on December 31, 2020, the Applicant has not and will not receive another loan under the Paycheck Protection Program."; and

b.   "I further certify that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects. I understand that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law, including under 18 USC 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000; under 15 USC 645 by imprisonment of not more than two years and/or a fine of not more than $5,000; and, if submitted to a federally insured institution, under 18 USC 1014 by imprisonment of not more than thirty years and/or a fine of not more than $1,000,000."

## OVERVIEW OF THE PAYCHECK PROTECTION PROGRAM FRAUD

42.   On or about April 21, 2020, AMEET GOYAL, the defendant, applied for a loan ("Loan-1") under the PPP from a financial institution headquartered in Manhattan, New York ("Bank-1").  The loan application for Loan-1 (the "Loan-1 Application") sought a $358,700 PPP loan for the business "Ameet Goyal," doing business as "Eye associates."

43. Loan-1 Application represented the applicant as a C-corporation with a business address in Rye, New York ("Business Address-1"). As the applicant's business identification number, the Loan-1 Application listed AMEET GOYAL, the defendant's, own social security number.

44. Loan-1 Application listed "Ameet Goyal" as the President and 100% owner of the applicant.

45. On or about April 29, 2020, AMEET GOYAL, the defendant, applied for a second loan ("Loan-2") from Bank-1 under the PPP, this time in the amount of $278,500. The loan application for Loan-2 (the "Loan-2 Application") represented the applicant as "Rye eye associates."

46. Loan-2 Application represented the applicant as a sole proprietorship located at Business Address-1, the same address as that of the business listed in the Loan-1 Application. For the applicant's business identification number, the Loan-2 Application listed a number that is the Employer Identification Number for Ameet Goyal MD PC.

47. Loan-2 Application listed "Ameet Goyal" as the President and 100% owner of the applicant.

48. In connection with the Loan-1 Application, AMEET GOYAL, the defendant, submitted to Bank-1 a payroll report for his business, printed on April 7, 2020 (the "Payroll Report"). The

Payroll Report is titled "CARES SBA-PPP: Employee Detail From: 01/01/19 To: 12/31/19," identifies the underlying business as Ameet Goyal MD PC, provides the names and payroll expenses for each employee, and represents the business's per-employee payroll expenditures for each month of 2019, with an average 2019 monthly payroll cost of $97,272,77 for the business.

49. Although the Loan-2 Application purported to be for a different loan, with a different loan amount, to a different business name, with a different business identification number than the business in the Loan-1 Application, AMEET GOYAL, the defendant, submitted the exact same Payroll Report in support of the Loan-2 Application to Bank-1.

50. On both Applications, AMEET GOYAL, the defendant, answered "No" to the Pending Charges Question, and electronically placed his initials "AG" directly under his "No" response.

51. In each of the Applications, AMEET GOYAL, the defendant, stated or certified, in substance and in part, the following:

a. Ameet Goyal, as the applicant or owner of applicant, is not an owner of any other business, and does not have common management with any business other than the listed applicant;

b.   Neither the applicant nor any individual owning 20% or more of the equity of the applicant was subject to an indictment, criminal information, arraignment, or other means by which formal criminal charges are brought in any jurisdiction, or presently incarcerated, or on probation or parole;

c.   During the period beginning on February 15, 2020 and ending on December 31, 2020, the applicant has not and will not receive another loan under the Paycheck Protection Program;

d.   The information provided in the loan application and in all supporting documents and forms is true and accurate in all material respects; and

e.   Ameet Goyal understood that knowingly making a false statement to obtain a guaranteed loan from the SBA is punishable under the law.

52.   AMEET GOYAL, the defendant, electronically signed and submitted each of the Applications to Bank-1.

53.   Following submission of the Applications, Bank-1 advised AMEET GOYAL, the defendant, that the respective Application was approved by the SBA, and that the applicant would need to execute a loan note in order for the loan to be funded.

54.   Bank-1's signing instructions to each loan note advised, "**REMINDER: The Small Business Administration, in**

20

consultation with the Secretary of the Treasury, has determined that no eligible borrower may receive more than one PPP loan. A one loan per borrower limitation is necessary to help ensure that as many eligible borrowers as possible obtain PPP loans. If you have already received a PPP loan, **you may not execute a loan note for another.**" (Emphasis in original.)

55. On or about May 3, 2020, AMEET GOYAL, the defendant, electronically executed the loan note for Loan-1 in the amount of $358,700.

56. On or about May 2 and 4, 2020, AMEET GOYAL, the defendant, executed multiple identical versions of the loan note for Loan-2 in the amount of $278,500.

57. Bank-1 funded Loan-1 in full to a bank account controlled by AMEET GOYAL, the defendant, ending in digits 6891 (the "Goyal Account") on or about May 4, 2020.

58. Bank-1 funded Loan-2 in full to the Goyal Account on or about May 11, 2020.

## STATUTORY ALLEGATIONS

59. From at least in or about April 2020 through at least in or about June 2020, in the Southern District of New York and elsewhere, while AMEET GOYAL, the defendant, was on release pursuant to an order of the United States District Court for the Southern District of New York, dated on or about November 22, 2019,

issued pursuant to Title 18, United States Code, Section 3142(c), AMEET GOYAL, the defendant, willfully and knowingly executed, and attempted to execute, a scheme and artifice to defraud financial institutions, the deposits of which were insured by the Federal Deposit Insurance Corporation ("FDIC"), and to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, such financial institutions, by means of false and fraudulent pretenses, representations, and promises, to wit, GOYAL engaged in a scheme to obtain over $630,000 in Government-guaranteed loans for the Practice from an FDIC-insured bank through the PPP by means of false and fraudulent pretenses, representations, and documents.

(Title 18, United States Code, Sections 1344, 3147(1), and 2.)

## COUNT FIVE

### (Making False Statements to a Bank)

The Grand Jury further charges:

60.   The allegations contained in paragraphs 1 through 59 of this Indictment are repeated and realleged as if fully set forth herein.

61.   From at least in or about April 2020 through at least in or about June 2020, in the Southern District of New York and elsewhere, while AMEET GOYAL, the defendant, was on release pursuant to an order of the United States District Court for the

22

Southern District of New York, dated on or about November 22, 2019, issued pursuant to Title 18, United States Code, Section 3142(c), AMEET GOYAL, the defendant, knowingly made false statements and reports and willfully overvalued land, property, and security, for the purpose of influencing the actions of financial institutions, the accounts of which were insured by the FDIC, in connection with an application, advance, discount, purchase, purchase agreement, repurchase agreement, commitment, and loan, to wit, GOYAL made false statements to an FDIC-insured bank regarding, among other things, GOYAL and the Practice's eligibility for a PPP loan, the absence of any pending criminal charges against GOYAL, and certification not to obtain more than one PPP loan, for the purpose of obtaining over $630,000 in Government-guaranteed loans for the Practice through the PPP.

(Title 18, United States Code, Sections 1014, 3147(1), and 2.)

## COUNT SIX
### (Making False Statements)

The Grand Jury further charges:

62.   The allegations contained in paragraphs 1 through 59 of this Indictment are repeated and realleged as if fully set forth herein.

63.   From at least in or about April 2020 through at least in or about June 2020, in the Southern District of New York

23

and elsewhere, while AMEET GOYAL, the defendant, was on release pursuant to an order of the United States District Court for the Southern District of New York, dated on or about November 22, 2019, issued pursuant to Title 18, United States Code, Section 3142(c), AMEET GOYAL, the defendant, in a matter within the jurisdiction of the executive branch of the Government of the United States, knowingly and willfully made a materially false, fictitious, and fraudulent statement and representation and made and used a false writing and document knowing the same to contain a materially false, fictitious, and fraudulent statement and entry, to wit, GOYAL made false statements to the SBA regarding, among other things, GOYAL and the Practice's eligibility for a PPP loan, the absence of any pending criminal charges against GOYAL, and certification not to obtain more than one PPP loan, for the purpose of obtaining over $630,000 in Government-guaranteed loans for the Practice through the PPP.

(Title 18, United States Code, Sections 1001, 3147(1), and 2.)

## FORFEITURE ALLEGATION

64. As a result of committing the offenses alleged in Counts One, Two, and Three of this Indictment, AMEET GOYAL, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(7), any and all property, real and personal, that constitutes or is derived, directly or

indirectly, from gross proceeds traceable to the commission of said offenses, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses.

65. As a result of committing the offenses alleged in Counts Four and Five of this Indictment, AMEET GOYAL, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(2)(A), any and all property constituting or derived from, proceeds obtained directly or indirectly, as a result of the commission of said offenses, including but not limited to a sum of money in United States currency, representing proceeds traceable to the commission of said offenses.

66. As a result of committing the offense alleged in Count Six of this Indictment, AMEET GOYAL, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(3), any and all property constituting or derived from, proceeds obtained directly or indirectly, as a result of the commission of said offense, including but not limited to a sum of money in United States currency, representing proceeds traceable to the commission of said offense.

### Substitute Assets Provision

67. If any of the above described forfeitable property,

as a result of any act or omission of the defendants:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with,

a third person;

(c) has been placed beyond the jurisdiction of the Court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot

be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United

States Code, Section  853(p) and Title 28, United States Code,

Section 2461(c), to seek forfeiture of any other property of the

defendant up to the value of the above forfeitable property.

(Title 18, United States Code, Section 982;
Title 21, United States Code, Section 853; and
Title 28, United States Code, Section 2461.)

FOREPERSON

AUDREY STRAUSS
Acting United States Attorney

26

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

AMEET GOYAL,

Defendant.

### SUPERSEDING INDICTMENT

S1 19 Cr. 844 (CS)

(Title 18, United States Code,
Sections 1001, 1014, 1035, 1343, 1344,
1347, 3147 & 2)

AUDREY STRAUSS
Acting United States Attorney.

*[signature]*