UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　　v.<br><br>AMEET GOYAL,<br><br>　　　　　　　Defendant. | No. S1 19-cr-844 (CS) |

**SENTENCING MEMORANDUM OF AMEET GOYAL**

Marc L. Mukasey
Torrey K. Young
Stephanie Guaba

MUKASEY FRENCHMAN LLP
570 Lexington Avenue, Suite 3500
New York, New York 10022
Tel: (212) 466-6400

*Attorneys for Ameet Goyal*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

THE CRIMINAL CONDUCT............................................................................................... 2

THE PLEA AGREEMENT AND PRESENTENCE REPORT ..................................... 3

18 U.S.C. SECTION 3553(a) FACTORS COUNSEL A LENIENT SENTENCE FOR AMEET GOYAL............................................................................................................................ 5

   A.   NATURE AND CIRCUMSTANCES OF THE OFFENSE............................................. 7

   B.   AMEET GOYAL'S PERSONAL HISTORY AND CIRCUMSTANCES...................... 9

      1.   Early Life and Background........................................................................... 10

      2.   Medical Career and Private Practice............................................................. 11

      3.   Family Life and Community.......................................................................... 15

   C.   GENERAL AND SPECIFIC DETERRENCE .................................................... 18

   D.   AVOIDANCE OF UNWARRANTED SENTENCING DISPARITY ........................... 20

CONCLUSION........................................................................................................................ 23

# TABLE OF AUTHORITIES

**CASES**

*Gall v. United States*,
552 U.S. 38 (2007)..................................................................................... 5, 9

*Kimbrough v. United States*,
552 U.S. 85 (2007)......................................................................................... 5

*Koon v. United States*,
518 U.S. 81 (1996)......................................................................................... 7

*McCarthy v. United States*,
394 U.S. 459 (1969)....................................................................................... 4

*Pepper v. United States*,
562 U.S. 476 (2011)................................................................................. 7, 10

*Rita v. United States*,
551 U.S. 338 (2007)....................................................................................... 5

*United States v. Adelson*,
441 F. Supp. 2d 506 (S.D.N.Y. 2006) ........................................................... 7

*United States v. Ahmadani*,
No. 12-cr-20042-JEL-RSW (E.D. Mich. Sept. 22, 2016) ........................... 22

*United States v. Ahmed*,
No. 14-cr-277-DLI, (E.D.N.Y. Dec. 28, 2017)............................................ 21

*United States v. Boscarino*,
437 F.3d 634 (7th Cir. 2006) ....................................................................... 20

*United States v. Booker*,
543 U.S. 220 (2005) .......................................................................................6

*United States v. Broce*,
488 U.S. 563 (1989)....................................................................................... 4

*United States v. Bryson*,
229 F.3d 425 (2d Cir. 2000) ........................................................................ 10

*United States v. Emmenegger*,
329 F. Supp. 2d 416 (S.D.N.Y. 2004) ......................................................... 18

*United States v. Gaind*,
829 F. Supp. 669 (S.D.N.Y. 1993), *aff'd*, 31 F.3d 73 (2d Cir. 1994)........................................ 18

*United States v. Hameedi,*
    No. S3 17-cr-137-JGK (S.D.N.Y May 15, 2021) ...................................................... 8, 21

*United States v. Klein,*
    543 F.3d 206 (5th Cir. 2008) ...................................................................................... 8

*United States v. Louchart,*
    680 F.3d 635 (6th Cir. 2012) .................................................................................. 4, 5

*United States v. Mahmood,*
    820 F.3d 177 (5th Cir. 2016) ...................................................................................... 8

*United States v. Medina,*
    485 F.3d 1291 (11th Cir. 2007) .................................................................................. 8

*United States v. Melgen,*
    No. 15-cr-80049-KAM, (S.D.F.L. Nov. 28, 2017)........................................... 21, 22

*United States v. Moore,*
    No. 92-CR-200-1 (NGG), 2015 WL 9413099 (E.D.N.Y. Dec. 22, 2015) .............. 19

*United States v. Morad,*
    No. 13-cr-101-SSV-DEK, (E.D. La. Dec. 16, 2015)............................................... 22

*United States v. Ruiz,*
    No. 04CR.1146-03(RWS), 2006 WL 1311982 (S.D.N.Y. May 10, 2006) ............. 19

*United States v. Seabrook,*
    968 F.3d 224 (2d Cir. 2020) ...................................................................................... 7

*United States v. Stewart,*
    590 F.3d 93 (2d. Cir. 2009) ............................................................................... 18, 19

*United States v. Thavaraja,*
    740 F.3d 253 (2d Cir. 2014) ...................................................................................... 5

*United States v. Vivit,*
    214 F.3d 908 (7th Cir. 2000) ...................................................................................... 8

*United States v. Wills,*
    476 F.3d 103 (2d Cir. 2007) .................................................................................... 20

*Wasman v. United States,*
    468 U.S. 559 (1984).................................................................................................. 10

**STATUTES**

18 U.S.C. § 3553 ..................................................................................... 1, 6, 9, 18, 20

This Sentencing Memorandum is respectfully submitted on behalf of defendant Ameet Goyal, who is scheduled to be sentenced by this Court on March 3, 2022.

## PRELIMINARY STATEMENT

On September 13, 2021, Ameet Goyal pleaded guilty before this Court pursuant to a plea agreement to the six counts of the Superseding Indictment.  ECF No. 21.  Ameet accepts full responsibility for his offenses.  He is profoundly remorseful for violating the law and abusing the trust that patients, co-workers, insurance companies, and the government placed in him as a physician.  He recognizes that his post-indictment criminal conduct – during a pandemic – renders him even more blameworthy than most defendants.  Ameet also appreciates that his actions across all the charged counts were motivated by arrogance and a misguided desire to accumulate wealth. He is deeply ashamed of, and apologetic for, his conduct.

Ameet loved being a doctor.  As a result of his crimes, he lost his medical license, his business, and his sense of self.  He will never practice medicine again, ending his life's calling. He has already lost much of his liberty due to almost two years of home confinement.  He will appear at sentencing a 58 year-old man, broken and humbled, who is prepared to endure only because he is supported by loving family and friends.

Ameet respects the Guidelines stipulations and calculations in the plea agreement and nothing set forth herein should be taken to the contrary.  This Sentencing Memorandum is intended solely to help the Court fashion a sentence that is "sufficient, but not greater than necessary" to achieve the goals enumerated in 18 U.S.C. § 3553(a)(2).

We hope the Court will begin its assessment of Ameet by recognizing the steps he has already taken to help right his wrongs.  Following his guilty plea, Ameet provided contact information to the government for many of the patients who were victims of his health care fraud

in order to assist the government's victim outreach efforts.  Ameet also initiated liquidating his

retirement account, the vast majority of his personal holdings, and arranged to make this

substantial payment (minus taxes and penalties) to the government to begin his restitution efforts

and try to reimburse swiftly those who were hurt by his conduct.

## THE CRIMINAL CONDUCT

At his guilty plea hearing, Ameet pleaded guilty to the essential elements of each count of

the Superseding Indictment.  ECF No. 21.  He allocuted as follows:

> Between 2010 and 2017, I made false statements to
> insurance companies and to the government's Medicare program.
> The false statements were material because they related to CPT
> codes and other things that determine the reimbursement I
> received for providing medical services. I made these false
> statements and I caused people who worked for me to make them
> in order to get reimbursed for medical services at a higher
> rate than I was entitled.
>
> My actions were intentional and willful. I knew what
> I was doing was wrong, and it took place by wire communications
> in and around Westchester.
>
> As you know, Judge, I got indicted for making those
> false statements about coding, and while I was out on bail in
> April of 2020, I applied for SBA loans to my business through
> Citibank, and when I applied for the loans, I didn't disclose
> truthfully on the application forms that I was under criminal
> indictment because I knew it would disqualify me from getting a
> loan. Again, what I did was knowing, intentional and wrong.
>
> This also happened in Westchester.
>
> Your Honor, I love being a doctor. Aside from my
> family, it's been my whole life. It's been agonizing to give
> it up, but I'm here today without reservation to accept all
> responsibility for my conduct. What I did was wrong, plain and
> simple. No excuses. I apologize to the Court, to the
> government and insurance companies and to my community.

Sept. 13, 2021 Plea Conf. Tr. at 31-32.

In colloquy with the Court, Ameet also confirmed that he understood that submitting false claims would result in getting reimbursed more money than had he been truthful.  Plea Conf. Tr. at 33:1-7.  He also assumed responsibility for knowing that the false statements in his bank loan applications were material.  *Id.* at 33:13-17.

### THE PLEA AGREEMENT AND PRESENTENCE REPORT

Pursuant to the plea agreement, dated September 12, 2021, and applying the November 1, 2018 edition of the Guidelines Manual, the parties stipulated to the following:

> Pursuant to U.S.S.G. § 2B1.1(a)(1), because one of the grouped offenses of conviction has a statutory maximum term of imprisonment of 20 years or more, the base offense level is **7**.

> Pursuant to U.S.S.G. § 2B1.1(b)(1)(J), because the total loss is more than $3,500,000 and less than $9,500,001, the offense level is increased by **18** levels.

> Pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(i), because the offense involved 10 or more victims, the offense level is increased by **2** levels.

> Pursuant to U.S.S.G. § 2B1.1(b)(7)(B)(i), because the defendant was convicted of a Federal health care offense involving a Government health care program and the loss to the Government health care program was more than $1,000,000, the offense level is increased by **2** levels.

> Pursuant to U.S.S.G. § 3B1.1(b), because the defendant was an organizer, leader, manager or supervisor of criminal activity, the offense level is increased by **2** levels.

> Pursuant to U.S.S.G. § 3B1.3, because the defendant abused a position of public and private trust and used a special skill in a manner that significantly facilitated the commission and concealment of the offense, the offense level is increased by **2** levels.

> Pursuant to U.S.S.G. § 3C1.3, because a statutory sentencing enhancement under 18 U.S.C. 3147 applies, the offense level is increased by **3** levels.

3

> Assuming the defendant clearly demonstrates acceptance of
> responsibility, to the satisfaction of the Government, through his
> allocution and subsequent conduct prior to the imposition of
> sentence, a **two-level reduction will be warranted**, pursuant to
> U.S.S.G. § 3E1.1(a).

At Criminal History Category I, the applicable Guidelines offense level is 34, which yields a range of 151 – 188 months' imprisonment.  The Probation Office submitted the same guidelines calculation to the Court in the Presentence Report ("PSR") and recommended a term of 151 months' imprisonment (the low-end of the range), plus 5 years' supervised release, $3,600,000 in restitution, a forfeiture order in the same amount, and a $600 special assessment.  PSR ¶ 76-93. The Probation Office did not recommend a fine.

Although Ameet does not contest in any way the essential elements of the government's case, it should be noted that the PSR includes in the Offense Conduct section several allegations and comments that were not contained in the charging instruments or the various agent affidavits. *See* ECF 101 at ¶¶ 31-32, 35-36, 38-40, 43.  Counsel objected to the inclusion of many of these additional allegations and opinions in the PSR, which extend beyond the essential facts and elements of the charged crimes and appear to be based on interviews of putative government witnesses, including a witness who received a non-prosecution agreement.

As stated in *United States v. Louchart,* 680 F.3d 635, 637 (6th Cir. 2012):

> Admission of facts from a guilty plea is limited to elements of the
> crime charged or those explicitly admitted to by the defendant. The
> Supreme Court for instance has carefully stated the scope of a guilty
> plea admission: "a guilty plea is an admission of all the elements of
> a formal criminal charge." *McCarthy v. United States*, 394 U.S. 459,
> 466 (1969). The Supreme Court has also described guilty pleas as
> "comprehend[ing] all of the factual and legal elements necessary to
> sustain a *binding, final judgment* of guilt and a lawful sentence."
> *United States v. Broce*, 488 U.S. 563, 569 (1989) (emphasis added).
> This limited language strongly suggests that a guilty plea does not
> constitute an admission of facts included in an indictment when
> those facts were not necessary to sustain a conviction."

4

*Louchart*, 680 F. 3d 635, 637 (6th Cir. 2012).

Consistent with *Louchart,* we respectfully submit that the Court adopt the essential facts and elements as set forth in the guilty plea allocution and the other undisputed facts in the PSR, and note Dr. Goyal's objection to paragraphs 31-32, 35-36, 38-40, and 43.

## 18 U.S.C. SECTION 3553(a) FACTORS COUNSEL A MOST LENIENT SENTENCE FOR AMEET GOYAL

The Sentencing Guidelines are only the "starting point and initial benchmark at sentencing." *Kimbrough v. United States*, 552 U.S. 85, 108-9 (2007), citing *Gall v. United States*, 552 U.S. 38, 39 (2007).   The Court may not simply presume that the Guidelines range is reasonable.   *Gall*, 522 U.S. at 50.   While the Guidelines are only advisory at sentencing, it is incumbent upon the court to fairly appraise the rationale behind a particular guideline calculation to determine whether it reasonably assesses culpability for an offense in the typical case. *Kimbrough*, 552 U.S. 109 ("it is fair to assume that the Guidelines, insofar as practicable, reflect a rough approximation of sentences that might achieve 3553(a)'s objectives"), citing *Rita v. United States*, 551 U.S. 338, 349 (2007).   The sentencing court's analysis is guided by "[r]easonableness" and an "individualized application of the statutory sentencing factors."  *United States v. Thavaraja*, 740 F.3d 253, 259 (2d Cir. 2014) (citing *Gall*, 552 U.S. at 46–47).

As *Kimbrough* instructs, after the Court considers the applicable guidelines calculation, it must make an individualized assessment of the case-specific factors to determine whether, "in a particular case, a within-Guidelines sentence is 'greater than necessary' to accomplish the goals of sentencing."  *Kimbrough*, 552 U.S. 101, citing 18 U.S.C. § 3553(a).  The "greater than necessary" language of the federal sentencing statute incorporates the need for the sentence to "reflect the

seriousness of the offense," "promote respect for the law," and "provide just punishment for the offense." 18 U.S.C. § 3553(a).

The federal sentencing system is ultimately governed by 18 U.S.C. § 3553(a). *United States v. Booker*, 543 U.S. 220, 233-34 (2005). According to § 3553: "[t]he court shall impose a sentence sufficient, but not greater than necessary to comply with the purposes set forth in [the federal sentencing statutes]." According to those enumerated purposes, a fair and just sentence should:

> (A) Reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense; (B) afford adequate deterrence to criminal conduct; (C) protect the public from further crimes of the defendant; and (D) provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2). Section 3553(a) goes on to provide a list of seven factors for courts to consider in determining a reasonable sentence in addition to the general purposes set forth above. Those factors include:

> (1) The nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed [to reflect the above-stated general sentencing goals]; (3) the kinds of sentences available; (4) the kinds of sentences and the sentencing range established [under the Sentencing Guidelines] subject to any amendments made to such Guidelines by an act of Congress…; (5) any pertinent policy statement . . . issued by the Sentencing Commission subject to any amendments made to such policy statement by an act of Congress…; (6) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to the victims of the offense.

18 U.S.C. § 3553(a).

Finally, "[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique

study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996).  Underlying that tradition is "the principle that the punishment should fit the offender and not merely the crime." *Pepper v. United States*, 562 U.S. 476, 487-88 (2011) (quotation and citation omitted).

A.  NATURE AND CIRCUMSTANCES OF THE OFFENSE

18 U.S.C. § 3553(a) requires the court to consider the nature and circumstances of the offense.  *See United States v. Seabrook*, 968 F.3d 224, 235 (2d Cir. 2020) ("in selecting the appropriate sentence, the district court is also required to consider 'the nature and circumstances of the offense,' and thus may consider the factual context of the fraud as well as the statutory elements of the offense.") (internal citation omitted).  Ameet's conduct is set forth above, as stated in his guilty plea allocution.  While Ameet admits these allegations, the circumstances of the offense warrant a degree of mitigation.

Counts One and Two relate to health care fraud and false statements to Medicare.  ECF No. 21.  As courts in the Southern District have recognized, "the Sentencing Guidelines, because of their arithmetic approach and also in an effort to appear 'objective,' tend to place great weight on putatively measurable quantities, such as the weight of drugs in narcotics cases or the amount of financial loss in fraud cases, without, however, explaining why it is appropriate to accord such huge weight to such factors." *United States v. Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006) (citation omitted).

This case is appropriate for analysis under *Adelson*.  The Guidelines range applicable here, like most fraud causes, is driven principally by the amount of the loss.  Ameet takes full responsibility for the loss amount of $3.6 million as stipulated in the Plea Agreement.  Notwithstanding, we respectfully note that the loss amount can be driven by intended loss – the

amounts billed to insurance companies (which most doctors never expect to receive), or actual loss – the lesser amounts actually paid by the insurance companies.[1]  *See* Sept. 8, 2021 Motion Hearing Tr. at 22-27 (THE COURT: "That Medicare did not pay the billed amount but rather paid the flat amount, and then the same can be true for private insurance and that co-pays are fixed amounts and that the patients did not usually pay the full balance, all that can be explained to the jury…and the Defendant can argue to the jury that it shouldn't give much weight or it shouldn't give any weight to the amount billed.").

Additionally, other courts, in fashioning a just sentence, have taken into account that loss calculations often fail to credit the legitimate and necessary medical care that was provided.  *See* Application note 2B1.1(3)(E)(i) ("Loss shall be reduced by: The services rendered by the defendant or other persons acting jointly with the defendant to the victim before the offense was detected.").  This rule has generally been applied when the victims received value for the losses. *See, e.g*., *United States v. Mahmood,* 820 F.3d 177, 193 (5th Cir. 2016); *United States v. Klein*, 543 F.3d 206, 214 (5th Cir. 2008); *United States v. Medina*, 485 F.3d 1291, 1304 (11th Cir. 2007); *United States v. Vivit*, 214 F.3d 908, 915 (7th Cir. 2000).  It does not matter that the services were provided to patients and that for the most part Medicare and insurance companies were the ultimate victims of the fraud. Patients and insurance companies receive some value when beneficiaries received medically necessary care.  *See Klein*, 543 F.3d at 214; *Medina* 485 F.3d at 1304.  It does not matter that the insurance companies would have rejected the claim, had it known of the fraud.  Sentencing Tr. at 3-5.  *United States v. Hameedi*, No. S3 17-cr-137-JGK (S.D.N.Y May 15, 2021) (ECF No. 479).  That is immaterial to the question whether the value of services

---

[1] To date the government has not provided a breakdown of the loss amount as between insurance companies and individual patients.

provided should be deducted from loss calculations nonetheless. *Id*. at 5. It is always the case, and a truism, that Medicare and Medicaid would have rejected some claim if it had known that it was submitted fraudulently. *Id.* But that is irrelevant to the calculation of loss, if, in fact, medically necessary services were provided to those patients covered by Medicare and Medicaid. *Id.* Here, the government has acknowledged that these were real patients receiving real, albeit lesser, services, who often had good outcomes. Oct. 8, 2020 Telephonic Conf. Tr. at 6.

Counts Three, Four, and Five relate to loans that Ameet obtained fraudulently through the Small Business Association's PPP loan program. Ameet acknowledges the particularly egregious nature and appalling timing of this conduct. We call the Court's attention to the fact that the conduct was also basic, unsophisticated, undeveloped and uncomplicated. Indeed, the conduct was so rudimentary, defense-less, and senseless, that it may be viewed as a cry for help; it was more self-destructive than malevolent. As the Court observed at the arraignment, it seemed, "metaphorically" to be "practically suicidal." June 26, 2020, Arraignment at 7:22.[2]

B. AMEET GOYAL'S PERSONAL HISTORY AND CIRCUMSTANCES

18 U.S.C. § 3553(a)(1) provides that in determining the appropriate sentence, courts should consider "the history and characteristics of the defendant." As part of this analysis, a sentencing court must consider any and all information relating to the background, character and conduct of the defendant, in order to "make an individualized assessment based on the facts presented." *Gall v. United States*, 552 U.S. 38, 50 (2007). In *Pepper*, the Supreme Court reaffirmed the principle that "[p]ermitting sentencing courts to consider the widest possible breadth of information about a

---

[2] Furthermore, as explained in the defendant's PSR objections, the Citibank account had adequate funds for all the expenditures that were made prior to the deposit of the PPP loan funds. To our knowledge, the PPP loan funds that were deposited into the Citibank account were all still in the account at the time Citibank recouped the funds.

9

defendant 'ensures that the punishment will suit not merely the offense but the individual defendant.'" *Pepper*, 562 U.S. at 476 (2011) (citing *Wasman v. United States*, 468 U.S. 559, 564 (1984)).  Moreover, in attempting to ensure that the punishment fits the individual defendant, "a court's duty is always to sentence the defendant as he stands before the court on the day of sentencing." *United States v. Bryson*, 229 F.3d 425, 426 (2d Cir. 2000).  Thus, the defendant's "history and characteristics," the "likelihood that he will engage in future criminal conduct," "his present purposes and tendencies," and "the period of restraint and the kind of discipline that ought to be imposed upon him" are relevant.  *Pepper*, 562 U.S. at 492–93 (citations omitted).

Ameet Goyal is much more than a man who committed fraud crimes.  He is a complicated, sensitive, spiritual and humane person.  His punishment should be mitigated by the years of quality service he provided to patients and community prior to the charged conduct, and by the low-key life he lives, centered around his close-knit and loving family.  And even though his patients and insurance companies bore the brunt of his financial misconduct, and he betrayed the values he learned from his parents and shared with his children, we hope the Court will consider Ameet's devotion to his craft and his family in fashioning a most lenient sentence.

## 1.  Early Life and Background

Ameet Goyal is 58 years old.  He was born in Des Moines, Iowa, to Vijender Goel and Kamleshe Goel.  His father was a physician who left India for the United States with no money, and through hard work and devotion to patient care, became a much-loved practitioner in several communities.  Ameet describes his father as having a heart of gold and recalls indigent patients who made home-crafted gifts or brought soup to his father when they could not pay for his services.  Ameet's mother, now almost 82, was the rock of the family, and she raised the three children: Ameet; his brother Anuj, now a 50-year-old lawyer; and his sister, Anjali Goyal, now a 54-year-

old physician.  Of particular importance to Ameet was his mother's spiritual guidance, grounded in the Hindu principles of love, good conduct, and morality. They still pray together.

Ameet grew up in a close and supportive environment.  At times, however, his childhood was challenging.  The family moved frequently due to Vijender's medical practice.  Ameet lived in Des Moines, Iowa; Indiana; Brooklyn, New York; Seneca Falls, New York; and Canada while he was growing up.  As Ameet's mother described in her letter to the Court, "[Ameet] also had to deal with moving to many new places as my husband's career required us to move often, which required him to learn how to adapt to new places without having a single place to call home or develop early childhood friends."  *See* Letter from Kamleshe Goel.

Ameet attended high school at Culver Military Academy in Culver, Indiana, and Vanderbilt University.  He was an athlete and a scholar, who played football and fenced, and graduated from college *magna cum laude*.  Along the way, Ameet worked in his father's medical office as a receptionist and a medical assistant.  Ameet credits his father with teaching him how to listen to and understand patients, and be compassionate and sympathetic.

In January 2017, when Ameet's father passed away, he flew to India and spread his father's ashes in the sacred Ganges River.  The loss was devastating, but the memory of his father would continue to inspire Ameet.

### 2.  Medical Career and Private Practice

Following in his father's footsteps, Ameet went straight to medical school after college. He chose the University of Cincinnati College of Medicine because it was close to his family at the time.  After he graduated in 1989, Ameet completed a year-long internship at Ruby Memorial Hospital in West Virginia.  He remained in West Virginia for an additional two years for his residency in ophthalmology.  He then completed the final two years of his residency at the

University of Louisville and a fellowship in oculoplastics at the Willis Eye Hospital in Philadelphia.

Ameet began his private practice career at the medical offices of Simonton & Mickatavage in Rye, New York.  In 1996, he opened his own practice in Rye, New York, despite having few ties to the community.  Ameet was a solo practitioner from 1996 until 2001, and he built his patient base by establishing a reputation for being a good surgeon and working on staff at over ten hospitals in the area.  Ameet traveled hundreds of miles per month between staff positions to service the area hospitals.  As his patient base grew, he could not handle all of the work on his own and in 2001, he welcomed his first outside ophthalmologist to the practice.

Throughout the 2000s, Ameet's practice grew at a pretty rapid pace, in part because he received a continuous flow of referrals from other doctors.  He opened additional offices to serve patients near the area hospitals where he was on staff - first in Wappingers Falls, New York, followed by Greenwich, Connecticut, and then in Mt. Kisco, New York.  He also hired more ophthalmologists through the years to keep up with the needs of his growing practice.

Letters submitted by Dr. Goyal's colleagues demonstrate that they respected his commitment to his patients by always being available and exhibiting exceptional bedside manners.  He always sought to comfort his patients and provide good medical care.  As expressed by many of his colleagues, Dr. Goyal was the kind of physician who would be there for a friend or patient no matter what. The following are a few insights expressed by his colleagues:

Letter from Dr. Allan Brook, physician friend who trusted the care of his brother-in-law to Dr. Goyal:

> The Medical Advice I have received over the years when I call him about a patient's vision or cosmetic issue has always been stellar.  I will never forget how well he treated my brother in law who needed eye surgery.  Ameet was so compassionate and caring about every

12

> detail.  He called numerous times to make sure he was feeling well and made sure to follow up and go out of his way to make sure he had all the necessary medicines needed for a successful outcome.

Letter from Dr. Lawrence K. Fox, who regularly referred his patients that needed specialized attention:

> I am a general ophthalmologist who has practices in Poughkeepsie, N.Y. for the past 34 years and I am aware of the charges that Dr. Ameet Goyal is facing…Professionally, I have referred to Dr. Goyal well over two hundred patients over twenty-plus years for complex oculoplastics or orbital disease and he has always made himself readily available to those patients, regardless of insurance coverage or their ability to pay.

Letter from Dr. Ira Davis, referring doctor who collaborated with Dr. Goyal on patients with eyelid cancers:

> I have known Ameet for at least 15 years.  My practice is predominately Mohs and excisional surgery for skin cancer.  I have collaborated with Dr. Goyal involving eyelid cancers.  In his capacity as an oculoplastics surgeon, he has reconstructed many eyelid and periorbital cancers that I have removed with Mohs surgery.  He was forthcoming and interested in those patients.

Letter from Dr. Scott Graham, anesthesiologist who worked with Dr. Goyal from about 2012 to 2018 and noted Dr. Goyal's bedside manners:

> I have witnessed first hand the gratitude that Dr. Goyal's patients have for his work and bedside manner.  From my first day working in his office, I could see the respect his staff has for him as well as an appreciation for his sense of humor and approachability.

Ameet also cared deeply for his patients and students.  He taught the ophthalmology residents at the Westchester Medical Center for twenty-five years.

Letter from Dr. Joseph Tartaglia, President of Westchester Academy of Medicine:

> [H]e was very generous with his time. He gave of his time freely to for charitable events such as helping advanced medical education for the Westchester Academy of medicine. He attended our events

13

with the medical students of New York medical College to promote their education and careers.

Letter from Dr. Peter Acker, pediatrician:

I am a practicing pediatrician and first met Dr. Goyal when he came to University Hospital in Port Chester to deliver a lecture to my department. I was immediately impressed with his erudition and warm personality. Over the years I have had many occasions to refer patients to him. He was always responsive and delivered excellent care no matter what time of day or night and was generous with his time.

Letter from Dr. Charles Fierro, anesthesiologist:

Dr. Ameet Goyal has not only been a venerable and reputable colleague of mine, but also a willingly compassionate and considerate teacher to his students, residents, and fellow colleagues alike in regard to techniques and mastery of his specialty.

Letter from Dr. Sumati Deutscher, optometrist:

Ameet Goyal is been an true mentor for many years. I could always rely him for good advice on patient care and life in general. He is a caring man who took the extra step to care for the people around him. When I was a young doctor he sent me a entire library of books concerning the eyes which I still use to this day.

Notwithstanding these flattering and complimentary opinions, Ameet recognizes that he betrayed his oath as a doctor and that his misconduct diminishes, if not destroys, his clinical achievements.  He also understands that not all of his colleagues enjoyed working with him, nor did they always appreciate his clinical approach.  Plain and simple, he was arrogant.  But no longer. It is Ameet's most sincere hope that he can find a way, in prison and thereafter, to use his knowledge, experiences and compassion to make amends, be better, and do some good in the world.

14

### 3.   Family Life and Community

Outside the office, Ameet's life revolved around his wife and kids – and even more so today.  At the center of his world are his three children, Riya Goyal, age 29, a physician who is completing her residency in Long Island; Akash Goyal, age 28, a computer engineer who resides in Chicago; and Shivani Goyal, age 25, a doctoral candidate who resides in Blacksburg, Virginia. Letters from Ameet's children describe him as a loving and dedicated father.  His children, and an overwhelming number of letters from extended family and neighbors, describe how present Ameet was in their lives.  Ameet coached childhood sports teams, volunteered at school events, and prioritized his children's education over everything.  *See* Letter from Sara Linehan ("Ameet and Alka were active with PTO endeavors…including volunteering at the main fundraiser, the school fair. Ameet joined with the other dads in assisting in the installation of a new school playground."); Letter from Frank and Rita Longo ("Ameet has also engaged in many charitable activities, volunteered out our annual block parties, and was honored in the past by the American Diabetes Association for his contributions and support.").  As Akash Goyal describes in his letter to the Court, "[h]e worked long 6-7 days weeks, waking up early every single morning to cook me breakfast, go to work, take me to soccer games sometimes 90 minutes away, and teach me new SAT vocabulary every day.")  *See* Letter from Akash Goyal.  His daughter Riya Goyal similarly described, "[a]s a kid, despite his busy schedule, he made sure he was there for everything. Whether it was frying an egg for me before I went to school, sitting in the passenger seat teaching me to drive, or coaching my childhood softball games, he was always there for me."  *See* Letter from Riya Goyal.

Family and friends also describe Ameet as having a joyful presence and outgoing personality.  He tries to be a source of comfort for those around him, as was evident when his daughter, Shivani, suffered her own personal struggles.  Shivani shared in her letter:

> Although mental illness was not something that was talked about in his household growing up, my father was there for me when I faced my own struggles and was eager to learn, support, and find me the best care and resources.  I remember my father visiting me on Christmas Day while I was undergoing treatment.  He showed up wearing a Superman snuggie.  It was the first thing that had genuinely made me laugh in weeks, and I remember thinking how insanely lucky I was to have him as my day.

Letter from Shivani Goyal.

Ameet also considers himself blessed to be married to Alka Jain Goyal.  He is deeply humbled by the fact that she gave up her career in finance to move around the Midwest in support of Ameet's medical training and later raising their three children.  Ameet is under no illusions about who deserves the real credit for raising three kids who went to Harvard, University of Chicago, and Georgetown.  He knows that Alka is the reason that the Goyal's have another doctor, a computer scientist, and a PhD candidate in the family.

Alka describes Ameet as a "wonderfully supportive husband," a "fantastic father," and an "optimistic, warm, loving man" who "tries to help whomever he can."  *See* Letter from Alka Jain Goyal.  Alka has relied on Ameet during her own health scares, and she hopes to be able to do so in the future.  *Id.*  She describes Ameet today as a person who has "changed," for whom "[m]oney is no longer important," who "takes responsibility for his actions," and "still has a lot to give the world." *Id.*

Despite the demands of his profession and his immediate family, Ameet also made sure to make himself available to his extended family, neighbors, and friends.  Ameet's mother described,

16

> [t]hroughout his life, he has always focused on what is important –
> family, friends, his community, and his religion.  He has been a
> dedicated son who took care of his father who spent a long time
> suffering and eventually passing away with cancer.  He continues to
> be a dedicated son who looks after me and is constantly calling to
> make sure I am okay or need anything, despite everything that he is
> going through.

*See* Letter from Kamleshe Goel.  Letters from family and friends describe Ameet as "the one

family member who 'showed up.'"  *See* Letter from Anuj Goel.  Ameet frequently provided

support to family and friends when they were experiencing medical struggles or going through a

challenge in life.  *See* Letter from Helene Byrnes ("Whenever we needed him, even at odd times

during the night he was available."); Letter from Amit Jain ("my father (Ameet's father in law)

got very ill with kidney failure…He would not only come and visit my father in the hospital after

his own work (a decent drive away) often, but he would counsel our entire family not only on my

father's medical condition but also relate other experiences he has seen in his line of work to make

the rest of us feel more comfortable[.]"); Letter from Shana De Caro ("He has been a steadfast

friend to me and my entire family. He is one of the few people we know can count on, for

anything."); Letter from Michael Bunsis ("My mother was diagnosed with a brain tumor in

Florida…Ameet took it upon himself to track down the surgeon during the surgery to help alleviate

my family's concerns.).

Ameet also received letters of support from prestigious members of the bar, including

Bruce Yannett, the Deputy Presiding Partner of Debevoise & Plimpton, and Michael Kaplen, a

prominent brain trauma lawyer.  Mr. Yannett wrote in his letter to the Court, "[t]he Ameet who

pled guilty to various felonies is not the Ameet I have known. Ameet has always been a warm and

compassionate friend, through good times and bad."  Letter from Bruce Yannett.  Mr. Yannett

went on to describe the emergency medical care Ameet provided to his daughter, for which he is eternally grateful.

Ameet also found satisfaction in his work at the Mount Vernon Hospital outpatient ophthalmology clinic, and his support of an eye clinic in India.  He hopes to one day be able to use his exceptional talents to volunteer in the community.

Whatever his shortcomings, and there are many, the people who know Ameet best remain in his corner, grateful for his compassion and kindness.  They understand the need for punishment, are prepared to help him rehabilitate, and, over time, will help him become a person who can give something back to society.

C.  GENERAL AND SPECIFIC DETERRENCE

According to 18 U.S.C. § 3553(a)(2), an appropriate sentence should "afford adequate deterrence to criminal conduct" and "protect the public from further crimes of the defendant."  These twin objectives can be achieved with a most lenient sentence.

As a result of his conduct, Ameet lost his medical licenses and his practice is closed.  His livelihood is forever gone.  He will not be in a position to commit fraud through his practice.  And Ameet understands that he lost the benefit of the doubt when he committed crimes while on bail, but since the PPP loan debacle, Ameet has been a model defendant in home confinement for almost two years.  He has abided by very strict conditions of release.  The criminal law has achieved its deterrence objectives.  *See United States v. Gaind*, 829 F. Supp. 669, 671 (S.D.N.Y. 1993), *aff'd*, 31 F.3d 73 (2d Cir. 1994) ("Elimination of the defendant's ability to engage in similar or related activities[,] or indeed any major business activity . . . constitutes a source of both individual and general deterrence."); *United States v. Emmenegger*, 329 F. Supp. 2d 416, 428 (S.D.N.Y. 2004); *United States v. Stewart*, 590 F.3d 93, 141 (2d. Cir. 2009) (conviction "made it doubtful that the

defendant could pursue his career as an academic or translator, and therefore . . . the need for further deterrence and protection of the public is lessened because the conviction itself already visits substantial punishment" (citation omitted).

Ameet's age is also relevant to assessing specific deterrence.  At 58, with several underlying health conditions, even the most lenient Guidelines sentence almost assures that Ameet will emerge from confinement a changed man physically and emotionally, and he will likely need a lot of assistance from his family.  Courts have declined to impose strict guidelines sentences on older defendants "on the grounds that such defendants exhibit markedly lower rates of recidivism in comparison to younger defendants." *United States v. Ruiz*, No. 04CR.1146-03(RWS), 2006 WL 1311982, at *4 (S.D.N.Y. May 10, 2006) (citations omitted); *see also United States v. Moore*, No. 92-CR-200-1 (NGG), 2015 WL 9413099, at *3 (E.D.N.Y. Dec. 22, 2015) ("Many courts have observed that recidivism is markedly lower for older defendants.") (citation omitted).

Moreover, the collateral consequences of this case all but ensure that Ameet will not commit similar crimes in the future.  Such consequences not only affect whether punishment will afford adequate deterrence, they also impact the need "to provide just punishment for the offense," as outlined in § 3553(a)(2).  *See Stewart*, 590 F.3d at 141 (2d Cir. 2009) ("It is difficult to see how a court can properly calibrate a "just punishment" if it does not consider the collateral effects of a particular sentence.").  Here, there is no dispute that significant collateral consequences have resulted.

Ameet trained for nearly a decade to become an oculoplastic surgeon, often working more than six days a week for excessively long hours.  For decades, Ameet defined himself as a practitioner and teacher.  Losing his medical license after treating thousands of patients over the years stripped Ameet not only of his profession but also of his core identity.  As a consequence,

19

the past two years have been emotionally tormenting.  He is anxious and exhausted.  He is a pariah

in the Westchester Medical Community, no longer able to banter with patients he considered to be

friends, or conduct the oculoplastic research that he enjoyed in quieter moments.  The restrictions

placed on him during home confinement have also resulted in the loss of friendships, professional

associates, and the ability to be with family who need him at funerals and miss him at weddings.

Perhaps most painful was enduring his mother's health struggles without being able to assist her.

Motivated by the hope of seeing his mother once again after his incarceration, Ameet strives to

use this pain and punishment to remake himself as a more modest, chastened, and thankful person.

### D.  AVOIDANCE OF UNWARRANTED SENTENCING DISPARITY

18 U.S.C. § 3553(a)(6) requires the Court to consider sentences afforded to defendants

"with similar records who have been found guilty of similar conduct."  The primary purpose of

this provision is to reduce unwarranted sentence disparities nationwide.  *United States v. Wills*,

476 F.3d 103, 109 (2d Cir. 2007).  What the statute commands is for the Court to examine the

criminal conduct upon which the defendant's conviction is based, and in sentencing the defendant,

consider the sentences by other courts nationwide for similar criminal conduct.  *United States v.*

*Boscarino*, 437 F.3d 634, 638 (7th Cir. 2006) (noting that "the kind of 'disparity' with which §

3553(a)(6) is concerned is an unjustified difference across judges (or districts)").

A survey of caselaw reveals the following defendants who were convicted of similar

charges to Ameet and the sentences they received.

In *United States v. Hameedi*, the defendant, a cardiologist, was alleged to have participated

in a "12-year scheme to defraud Medicaid, Medicare, and other private health insurance companies

out of more than $50 million" the alleged fraud included "(1) making false representations to

insurance providers, including providers paid through Medicaid and Medicare, about the medical

condition of patients in order to obtain preauthorization for medical tests and procedures; (2) submitting false claims to insurance providers for tests and procedures that were not performed and/or medically unnecessary, as well as for drug items not used or provided; (3) paying exorbitant kickbacks to local primary care medical offices in exchange for lucrative referrals from these offices." *See* Department of Justice, *Cardiologist, Neurologist, And Others Charged In $50 Million Health Care Fraud Scheme, And Civil Suit Filed Against Clinic And Participants In The Fraud* (Mar. 1, 2017), https://www.justice.gov/usao-sdny/pr/cardiologist-neurologist-and-others-charged-50-million-health-care-fraud-scheme-and.   At sentencing the Court determined that the applicable guidelines range was 46 to 57 months.  *United States v. Hameedi*, No. 17-cr-137-JGK (S.D.N.Y. May 15, 2021) Sentencing Tr. at 7.   The Court imposed a sentence of 20 months' incarceration.  *Id.* at 50.

*United States v. Ahmed*, No. 14-cr-277-DLI, (E.D.N.Y. Dec. 28, 2017) (ECF No. 227) involved a New York area doctor who routinely billed Medicare for phantom surgical procedures. According to the government, the defendant billed Medicare approximately $85 million for 11 CPT Codes and was paid over $7 million in reimbursement for those purportedly provided services. The defendant faced a Guidelines range of 188 to 235 months after being convicted at trial.  *Id.*  He received a sentence of 156 months.  Department of Justice, New York Doctor Sentenced to 13 Years in Prison for Multi-Million Dollar Health Care Fraud (Feb. 7, 2018), https://www.justice.gov/opa/pr/new-york-doctor-sentenced-13-years-prison-multi-million-dollar-health-care-fraud.

In *United States v. Melgen*, No. 15-cr-80049-KAM, (S.D.F.L. Nov. 28, 2017) (ECF No. 441), a Florida ophthalmologist was convicted after trial of sixty-seven counts related to a healthcare fraud scheme.  Department of Justice, *South Florida Doctor Convicted of Sixty-Seven*

*Criminal Counts Related to Medicare Fraud Scheme* (Apr. 28, 2017), https://www.justice.gov/usao-sdfl/pr/south-florida-doctor-convicted-sixty-seven-criminal-counts-related-medicare-fraud.  The defendant was alleged to have billed the Medicare program more than $190 million, for which he was reimbursed $105 million.  *Id.*  The defendant faced a guidelines range of 360 months-to-life and received a sentence of 204 months.  *United States v. Melgen*, No. 15-cr-80049-KAM, (S.D.F.L. Feb. 22, 2018) (ECF No. 489).

Two physicians in New Orleans were convicted after trial of carrying out a home healthcare fraud scheme over the course of ten years.  According to the government, the scheme involved multiple companies and the submission of more than $56 million in claims to Medicare, of which $50.7 million were paid.  Department of Justice, *New Orleans Doctors and Registered Nurse Sentenced for Roles in $50 Million Fraud Scheme* (Dec. 16, 2015), https://www.justice.gov/opa/pr/new-orleans-doctors-and-registered-nurse-sentenced-roles-50-million-fraud-scheme.  The first physician faced a guidelines range of 135 to 168 months, and was sentenced to 80 months.  Appeal Tr. at 8-13, *United States v. Morad*, No. 13-cr-101-SSV-DEK, (E.D. La. Dec. 16, 2015) (ECF No. 555).  The second physician faced a guidelines range of 97 to 120 months and was sentenced to 64 months.  Appeal Tr. at 4-6, *United States v. Morad*, No. 13-cr-101-SSV-DEK (ECF No. 556).

A physical therapist who co-owned one of several fraudulent home health agencies involved in a home healthcare fraud received a significant downward variance after his conviction at trial.  *See United States v. Ahmadani*, No. 12-cr-20042-JEL-RSW (E.D. Mich.).  The defendant according to the government's sentencing submissions, helped perpetrate a scheme that "specifically targeted and exploited indigent Medicare beneficiaries," submitting over $44 million in Medicare claims, of which $38 million was paid.  Sentencing Memo. at 1-4, *United States v.*

*Ahmadani*, No. 12-cr-20042-JEL-RSW (E.D. Mich. Sept. 22, 2016) (ECF No. 263).  The Court determined the defendant's guidelines range to be 180 months and imposed a below-guideline sentence of 96 months.  Sentencing Tr. at 53-54, 76-79, 96, *United States v. Ahmadani*, No. 12-cr-20042-JEL-RSW (ECF No. 296).

We trust the Court will consider Ameet's crimes relative to those set forth above, and sentence him with similar compassion.

## CONCLUSION

For the foregoing reasons, we respectfully ask the Court to impose, consistent with applicable law, the most lenient sentence possible, with the shortest term of incarceration, and one that will return Ameet Goyal to his family as soon as possible.

Dated: February 17, 2022                    Mukasey Frenchman LLP
      New York, New York

                                               /s/ Marc L. Mukasey
                                              Marc L. Mukasey
                                              Torrey K. Young
                                              Stephanie Guaba

                                              570 Lexington Avenue, Suite 3500
                                              New York, New York 10022
                                              Tel: (212) 466-6400
                                              Email: marc.mukasey@mfsllp.com

                                              *Counsel for Defendant Ameet Goyal*